UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOSHUE M. HUERTA,                        )       Case No. CV 13-4358-JEM
                                         )
                    Petitioner,          )
                                         )       MEMORANDUM OPINION AND ORDER
         v.                              )       DENYING PETITION FOR WRIT OF
                                         )       HABEAS CORPUS
G.D. LEWIS, Warden,                      )
                                         )
                    Respondent.          )
_____ )

**PROCEEDINGS**

On June 17, 2013, Joshue M. Huerta ("Petitioner"), a prisoner in state custody, filed a

Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. Section 2254 ("Petition").  On

September 5, 2013, Warden G. D. Lewis ("Respondent") filed an Answer and lodged the

pertinent state record.  On November 1, 2013, Petitioner filed a Traverse.  The matter is

ready for decision.

The parties have consented to proceed before the Magistrate Judge.

**PRIOR PROCEEDINGS**

On July 8, 2011, a Los Angeles County Superior Court jury acquitted Petitioner of the

charged offense of attempted murder and found him guilty of the lesser included offense of

attempted voluntary manslaughter (Cal. Penal Code ¶¶ 192(a), 664).  (Lodged Document

["LD"] 1, Clerk's Transcript ["CT"] 209-10, 213.)  The jury found true allegations that Petitioner inflicted great bodily injury on the victim, personally used a firearm, personally and intentionally discharged a firearm, and committed the crime for the benefit of a criminal street gang.  (CT 210, 213-14.)  On July 27, 2011, the trial court sentenced Petitioner to state prison for an aggregate term of 19 years and 6 months.  (CT 248, 253.)

Petitioner filed an appeal in the California Court of Appeal.  (LD 4.)  On September 28, 2012, the Court of Appeal issued an unpublished decision reversing Petitioner's five-year gang enhancement and affirming the judgment in all other respects.  (LD 7 at 10-11; see CT 249.)  Petitioner filed a petition for review in the California Supreme Court.  (LD 8.)  On December 12, 2012, the California Supreme Court summarily denied review.  (LD 9.)

## SUMMARY OF EVIDENCE AT TRIAL

Based on its independent review of the record, the Court adopts the following factual summary from the California Court of Appeal's unpublished opinion as a fair and accurate summary of the evidence presented at trial:

### A. Preliminary Hearing Testimony of the Victim, Luis Fernandez

Fernandez testified that late one night he was riding with his friend, Chuckie, in Chuckie's truck.  Chuckie was wearing a baseball cap backwards. The cap had the letter "B" on it.[1]  Fernandez did not belong to a gang.  When Chuckie pulled into a gas station and convenience store in South Los Angeles a black car drove slowly by and the occupants gave Fernandez and Chuckie a "mad-dog look."[2]  Chuckie went into the store to pay for the gas. While Fernandez waited in the truck he saw defendant Huerta and another man

---

[1]     Subsequent evidence showed that Chuckie was a member of a gang called the Bud Smokers Only or BSO.

[2]     Fernandez did not explain what he meant by the term "mad dog look" but we understand the term to mean looking at a person in a hard or threatening manner.

1    come from the direction that the black car had driven and enter the store.[3]  At

2    first Huerta and the other man talked to Chuckie.  Then a fight broke out and

3    Fernandez went to help his friend.  As he approached the store he heard a

4    gunshot and saw Huerta standing outside the store with a gun in his hand.

5    Huerta raised the gun and pointed it in Fernandez's direction.  Fernandez

6    "started running in the opposite direction."  As he ran he heard a gunshot and

7    felt his left leg go numb and start to bleed.[4]

8          As discussed more fully below, the prosecution could not locate

9    Fernandez and procure his attendance at trial.  The court declared Fernandez

10   "unavailable" as a witness and admitted his preliminary hearing testimony into

11   evidence.

12   **B. Gang Enhancement Testimony**

13          Detective Eduardo Aguirre of the Los Angeles County Sheriff's

14   Department testified as the prosecution's gang expert.  He identified Chuckie

15   as a member of the Bud Smokers Only (BSO) gang.  He identified Huerta as a

16   member of a rival gang, the Chakalosos (also known as CKS).  The primary

17   activities of CKS included murders, drive-by shootings, robberies, and

18   narcotics sales.  Aguirre testified that the gas station where the shooting

19   occurred was in rival gang BSO's territory.  In Aguirre's opinion the shooting of

20   Fernandez benefited CKS.  Huerta and his companion would have recognized

21   Chuckie as a BSO member by the letter B on his cap.  His wearing the cap

22   backward was a sign of disrespect to any rival gang member who saw it.

23

24    [3]       Subsequent evidence showed that Huerta and his companion were members of
the Chakalosos (CKS) gang.

25

26    [4]       The undisputed evidence, however, showed that the only bullet that struck
Fernandez entered through the front of his leg, not the back as it would have if he had
been shot while running away from Huerta.

27

28                        3

Huerta's fighting a BSO member and shooting his companion in BSO territory
would benefit CKS by "add[ing] another notch to the violent types of crimes
they commit in their area and outside their area."

**C. Huerta's Defense**

Huerta testified that he and a member of an allied gang went to the gas
station's convenience store to buy a glass pipe for smoking "dope."  He
acknowledged that the gas station was two miles from his home and in a rival
gang's territory but explained: "It's one o'clock in the morning.  There's not that
many gas stations that sell those pipes, and I go there a lot.  So it's a common
thing for me to go to the gas station."

While Huerta was standing in line at the counter waiting to buy his pipe,
the man in line in front of him (later identified as Chuckie) turned his cap
around.  To Huerta, this gesture meant that the man was a gang member and
there was going to be a confrontation.  When the man turned around and
faced him, Huerta believed the man was going to pull a gun or otherwise
attack him. Huerta shoved the man away and the man fell to the floor.  Still
fearing the man was going to pull a gun, Huerta drew his own gun and pointed
it at the floor.  When the man got up and ran into the store's supply room
Huerta left the store.  Huerta testified that when he exited the store the first
thing he saw was Fernandez running toward him.  Fernandez's "hand was in
his sweater pocket coming out."  Thinking Fernandez had a gun, Huerta fired
his gun toward Fernandez.  When Fernandez turned and began running away
Huerta fired his gun twice more, aiming into the air.

Huerta contended that he shot at Fernandez in self-defense or at the
very most in imperfect self-defense.  The court instructed the jury on both
theories.  On the latter theory the court told the jury: "An attempted killing that
would otherwise be attempted murder is reduced to attempted voluntary

4

1    manslaughter if the defendant attempted to kill a person because he acted in

2    imperfect self-defense."

3    (LD 7 at 2-4.)

4    **PETITIONER'S CONTENTIONS**

5    1.    Petitioner's confrontation rights were violated by the admission of the victim's

6    preliminary hearing testimony at trial.

7    2.    Trial counsel rendered ineffective assistance, in violation of the Sixth

8    Amendment, when he failed to argue that the prosecution did not show due diligence in

9    attempting to locate the victim because it did not invoke the provisions of a treaty between

10   the United States and Mexico.

11   **STANDARD OF REVIEW**

12   The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the

13   Court's consideration of Petitioner's cognizable federal claims.  28 U.S.C. § 2254(d), as

14   amended by AEDPA, states:

15   An application for a writ of habeas corpus on behalf of a person in custody

16   pursuant to the judgment of a State court shall not be granted with respect to

17   any claim that was adjudicated on the merits in State court proceedings unless

18   the adjudication of the claim – (1) resulted in a decision that was contrary to,

19   or involved an unreasonable application of, clearly established Federal law, as

20   determined by the Supreme Court of the United States; or (2) resulted in a

21   decision that was based on an unreasonable determination of the facts in light

22   of the evidence presented in the State court proceeding.

23   In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court held

24   that a state court's decision can be contrary to federal law if it either (1) fails to apply the

25   correct controlling authority, or (2) applies the controlling authority to a case involving facts

26   materially indistinguishable from those in a controlling case, but nonetheless reaches a

27   different result.  Id. at 405-06.  A state court's decision can involve an unreasonable

28   application of federal law if it either (1) correctly identifies the governing rule but then applies

it to a new set of facts in a way that is objectively unreasonable, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. Id. at 407-08.  The Supreme Court has admonished courts against equating the term "unreasonable application" with "clear error."  "These two standards . . . are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).  Instead, in this context, habeas relief may issue only if the state court's application of federal law was "objectively unreasonable."  Id.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, __ U.S. __, __, 131 S. Ct. 770, 786 (2011).

Under AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412 ("§ 2254(d)(I) restricts the source of clearly established law to this Court's jurisprudence"); see also Andrade, 538 U.S. at 71.  If there is no Supreme Court precedent that controls a legal issue raised by a habeas petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law.  Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam); see also Carey v. Musladin, 549 U.S. 70, 76-77 (2006).  A state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam); see also Bell v. Cone, 543 U.S. 447, 455 (2005) (per curiam).

A state court's silent denial of federal claims constitutes a denial "on the merits" for purposes of federal habeas review, and the AEDPA deferential standard of review applies.  Richter, 131 S. Ct. at 784-85.  Under the "look through" doctrine, federal habeas courts look through a state court's silent decision to the last reasoned decision of a state court, and apply the AEDPA standard to that decision.  See Ylst v. Nunnemaker, 501 U.S. 797, 803

1   (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later

2   unexplained orders upholding the judgment or rejecting the same claim rest upon the same

3   ground."). The AEDPA standard applies, however, even if no state court issued a decision

4   explaining the reasons for its denial of the federal claim. <u>Richter</u>, 131 S. Ct. at 784–85.

5        Petitioner presented his claims to the state courts on direct appeal. (LD 4, 8.) The

6   Court of Appeal rejected his claims in a reasoned decision and the California Supreme

7   Court summarily denied review. (LD 7, 9.) Accordingly, the Court looks through the

8   California Supreme Court's summary denial to the Court of Appeal's reasoned decision, and

9   applies the AEDPA standard to that decision. <u>See</u> <u>Ylst</u>, 501 U.S. at 803.

10                         **DISCUSSION**

11  **I.**    **PETITIONER'S CONFRONTATION CLAIM IN GROUND ONE DOES NOT**

12       **WARRANT FEDERAL HABEAS RELIEF.**

13        In Ground One, Petitioner contends that his right to confrontation under the Sixth

14   Amendment was violated by the admission of the preliminary hearing testimony of

15   Fernandez, because the trial court erred in finding that the prosecution had exercised due

16   diligence in attempting to locate him. (Petition at 5, Attachment ["Attach."] A at 1-3.) For the

17   reasons set forth below, the California Court of Appeal's rejection of this claim was not

18   contrary to, or an unreasonable application of, clearly established federal law as set forth by

19   the United States Supreme Court, nor did it rest on an unreasonable determination of the

20   facts in light of the evidence. 28 U.S.C. § 2254(d)(1)&(2).

21       **A.**    **Applicable Clearly Established Federal Law**

22        The Confrontation Clause of the Sixth Amendment, made applicable to state criminal

23   prosecutions through the Fourteenth Amendment, provides that the accused has the right to

24   "be confronted with the witnesses against him." U.S. Const. amend. VI; <u>Pointer v. Texas</u>,

25   380 U.S. 400, 404 (1965). In <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), the Supreme

26   Court held that the Confrontation Clause bars the "admission of testimonial statements of a

27   witness who did not appear at trial unless he was unavailable to testify, and the defendant

28   had had a prior opportunity for cross-examination." <u>Id.</u> at 53-54. A witness is "unavailable"

under the Confrontation Clause if "the prosecutorial authorities have made a good faith effort to obtain his presence at trial" but were unsuccessful.  Barber v. Page, 390 U.S. 719, 724-25 (1968); see also Jackson v. Brown, 513 F.3d 1057, 1083-84 (9th Cir. 2008).  The lengths to which the prosecution must go to produce a witness is a question of reasonableness.  See Hardy v. Cross, 132 S. Ct. 490, 494 (2011); Ohio v. Roberts, 448 U.S. 56, 74 (1980), overruled on other grounds by Crawford, supra.  When it is greatly improbable than an effort would result in locating the witness, reasonableness does not require undertaking the effort.  Roberts, 541 U.S. at 76.  Moreover, "the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken."  Hardy, 132 S. Ct. at 495.

**B.     Background**

On August 11, 2010, Fernandez testified at Petitioner's preliminary hearing.  (CT 15-53.)  Subsequently, the prosecutor filed a motion to allow the reading of Fernandez's preliminary hearing testimony at trial.  (LD 10, Exh. A.)  The prosecutor represented that Fernandez was unavailable because he had returned to Mexico and could not be located.  (Id.)  In an attached declaration, she described her efforts to locate Fernandez.  She declared that she: had numerous contacts with detectives regarding the progress of their attempts to obtain an address for Fernandez in Mexico; called the Mexican Consulate regarding obtaining assistance in locating Fernandez, but was told that the Mexican authorities required more specific information about his address; contacted an investigator to conduct a search for Fernandez in the United States; and submitted an application to the Department of Homeland Security to obtain parole to enable Fernandez to enter the country legally to testify.  (Id.)

The trial court conducted a hearing regarding the prosecution's due diligence in attempting to locate Fernandez.  (LD 3, 2 Reporter's Transcript ["RT"] 15.)  Detective Eduardo Aguirre testified that Fernandez testified reluctantly at the preliminary hearing because he was afraid.  (2 RT 27.)  Aguirre attempted to reestablish contact with Fernandez

1   in January 2011, but could not locate him.   (2 RT 17, 37.)   On April 13, 2011, Fernandez's

2   stepfather, Victor Hernandez, told Aguirre that Fernandez might be in Nayarit or Veracruz in

3   Mexico, but refused to provide an address or contact information.  (2 RT 17-19.)   Aguirre

4   testified that he contacted Fernandez's family "15 to 20 times to obtain updates," but never

5   received any address, telephone number, or other contact information for him.  (2 RT 20-

6   21.)  Aguirre could not find Fernandez based merely on information that he was in Nayarit or

7   Veracruz, which are states in Mexico.  (2 RT 20.)  Aguirre also spoke with gang members

8   with ties to Fernandez to ascertain whether, despite Hernandez's statements, Fernandez

9   was still in Los Angeles.  (2 RT 22-23.)  On June 7, 2011, Hernandez told Aguirre that

10  Fernandez might be in Tijuana and would try to cross into the United States, although he did

11  not have documentation enabling him to do so legally.  (12 RT 24-25.)  Aguirre did not

12  attempt to obtain Hernandez's telephone records to trace the telephone numbers of

13  Fernandez's calls.  (2 RT 36-27.)

14       Detective Joel Flores testified that he visited Fernandez's relatives approximately ten

15  times.  (2 RT 304.)  Flores considered subpoenaing Hernandez's telephone records, but

16  decided not to do so because Hernandez ran his business through his cellular telephone

17  and received many telephone calls.  (2 RT 306.)  Also, Hernandez told him that Fernandez

18  called from pay phones.  (2 RT 305.)  Flores was on a task force that had contacts with

19  Immigration and Customs Enforcement (ICE), and he told Hernandez that the District

20  Attorney's Office could assist Fernandez in entering the country legally to testify, but

21  Hernandez did not indicate any interest in that option.  (1 RT 316-17.)

22       District Attorney's Office investigator Jonathan Buchholz testified that he searched

23  various databases and contacted ICE and local hospitals, detention facilities and homeless

24  shelters.  He also visited an address he found through the Department of Motor Vehicles

25  records.  His search did not reveal any useful information.  (2 RT 338–41.)

26       The trial court found that the prosecution had shown due diligence.  (2 RT 610.)  The

27  search for Fernandez spanned six months and involved numerous visits to places

28  associated with him, but the detectives did not succeed in obtaining information that was

1   sufficiently specific to enable Mexican authorities to locate Fernandez.  The trial court also

2   noted that the detectives contacted ICE and told Hernandez that Fernandez could enter the

3   country legally in order to testify.  (2 RT 610-11.)  The trial court deemed Fernandez

4   unavailable as a witness and ruled that his preliminary hearing testimony could be read into

5   evidence.  (2 RT 611.)

6        **C.**    **California Court of Appeal's Decision**

7        On direct appeal, the Court of Appeal rejected Petitioner's argument that due

8   diligence "required the prosecution to apply for a warrant to tap Hernandez's telephone in

9   order to trace calls from Fernandez and to subpoena Hernandez's telephone records to look

10  for the telephone numbers of calls from Mexico." (LD 7 at 6.)  The Court of Appeal found

11  that it was not reasonably probable that a magistrate would have issued a wire tap order

12  under the circumstances of the case.  (Id.)  Moreover, it was highly unlikely that a search of

13  Hernandez's telephone records would have revealed information that could have been used

14  to locate Fernandez.  The Court of Appeal pointed out that Fernandez went to Mexico to

15  avoid testifying at Petitioner's trial, and Hernandez no doubt told him that the police were

16  looking for him.  Thus, it was not likely that Fernandez would have left a trail to follow, such

17  as calling from the places where he was staying.  Furthermore, Hernandez told the police

18  that Fernandez was moving from place to place in Mexico, and "any telephone number

19  retrieved would have been a cold lead once the machinery to follow the lead had been

20  engaged." (Id.)

21       The Court of Appeal also rejected Petitioner's argument that the prosecution did not

22  act in good faith because it failed to invoke the assistance of the Mexican authorities in

23  locating Fernandez under the Treaty of Cooperation between the United States of America

24  and the United Mexican States for Mutual Legal Assistance (the "Treaty").  (LD 7 at 7.)  It

25  found that Petitioner had forfeited that argument because trial counsel did not raise it at trial.

26  (Id.)  It nevertheless addressed Petitioner's arguments pertaining to the Treaty and rejected

27  them.  (Id. at 7-8.)  The Court of Appeal agreed that the Mexican Consulate had provided

28  incomplete information to the prosecutor when it failed to advise her that under the Treaty

Mexican authorities could compel Fernandez to appear in a Mexican court and testify at Petitioner's trial by teleconference,[5] but found that the Consulate's incomplete advice did not affect the search for Fernandez because the prosecutor and Detective Aguirre continued to seek him in Mexico.  (Id.)

The Court of Appeal also rejected Petitioner's argument that the prosecution should have invoked the terms of the Treaty imposing a duty on Mexican authorities to try to locate Fernandez.  (LD 7 at 8.) The Court of Appeal noted that the record showed that the prosecutor had contacted the Mexican Consulate and requested assistance, but the Consulate had requested more information before proceeding, such as the city or town where Fernandez resided.  (Id.)  Finally, the Court of Appeal rejected Petitioner's argument that the prosecutor should have made her request for assistance through the United States Department of Justice, rather than directly to the Mexican Consulate, because nothing in the Treaty specified to whom requests for assistance should be made.  (Id.)

**D.   Analysis**

As an initial matter, Respondent contends that the portion of Petitioner's claim pertaining to the Treaty is procedurally barred, because Petitioner did not raise it at trial.  (Answer at 14-16.)  Federal courts may address allegedly defaulted habeas claims on the merits if the lack of merit is clear but the procedural default issues are not.  Lambrix v. Singletary, 520 U.S. 518, 523-25 (1997); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).  In the interests of judicial economy, the Court has proceeded to the merits of the entirety of Petitioner's confrontation claim without addressing the procedural default issue.

Fernandez's preliminary hearing testimony was unquestionably testimonial.  See Crawford, 541 U.S. at 52 (noting that testimony at a preliminary hearing qualifies as "testimonial" under any definition).  Petitioner, however, had an opportunity to cross-examine Fernandez at the preliminary hearing and did so.  (CT 35-50, 51-52.)  Whether the admission of Fernandez's preliminary hearing testimony violated Petitioner's confrontation

---

[5]   The prosecutor declared that the Mexican Consulate told her that even if Fernandez was found, he could not be compelled to appear in court or cooperate.  (LD 10, Exh. A at 9.)

1  rights depends solely on whether Fernandez was "unavailable," that is, whether the state

2  made a sufficient effort to secure his presence at trial.  See Jackson, 513 F.3d at 1083

3  ("Jackson had an opportunity to cross-examine both [witnesses] at the preliminary hearing,

4  so the only question is whether the State made 'a good-faith effort' to procure their

5  appearance at trial.").

6         The Court finds that Petitioner has not met his burden of showing that the Court of

7  Appeal's conclusion that the prosecution had shown sufficient diligence to satisfy the

8  unavailability requirement "was so lacking in justification that there was an error well

9  understood and comprehended in existing law beyond any possibility for fairminded

10 disagreement." Richter, 131 S .Ct. at 786–87.  The record shows that efforts to locate

11 Fernandez began six months before trial.  (2 RT 17.)  The prosecution presented evidence

12 of numerous police contacts with Fernandez's family, who informed the police that

13 Fernandez was in Mexico but steadfastly refused to give his address, telephone number, or

14 any contact information.  (2 RT 17-22, 24.)  The prosecutor contacted the Mexican

15 Consulate, but was informed that Mexican authorities needed more specific information

16 about Fernandez's whereabouts in order to proceed.  (LD 10, Exh. A at 9.)  When the

17 detectives learned that Fernandez might be attempting to cross the border illegally into the

18 United States, the prosecutor contacted the immigration authorities and applied for parole to

19 enable him to enter legally to testify.  Fernandez's stepfather was informed that Fernandez

20 might be able enter the United States legally in order to testify, but did not indicate any

21 interest in this option.  (LD 10, Ex. A at 6, 9-10; 2 RT 315-16.)

22        Although Petitioner faults the prosecution for not invoking the Mexican authorities'

23 obligations under the Treaty, the Court of Appeal reasonably found that expressly invoking

24 the Treaty would have made no difference, because the prosecutor contacted the Mexican

25 Consulate, which requested more specific information about Fernandez's whereabouts than

26 the prosecutor was able to provide.  (LD 7 at 8; LD 10, Ex. A at 6, 9.)  Petitioner argues that

27 the prosecution would have been able to provide this information to the Mexican Consulate

28 if it had subpoenaed the telephone records of Fernandez's stepfather, who admitted to

1  being in regular contact with Fernandez.  (Petition, Attach. A at 3.)  However, the California

2  Court of Appeal reasonably found that it was unlikely that identifying the telephones from

3  which Fernandez called could have used to locate him, because he had gone to Mexico to

4  avoid testifying and was moving from place to place, trying not to be found.  (LD 7 at 6; see

5  2 RT 27.)

6        As the Supreme Court stated in Hardy, "when a witness disappears before trial, it is

7  always possible to think of additional steps that the prosecution might have taken to secure

8  the witness' presence, but the Sixth Amendment does not require the prosecution to

9  exhaust every avenue of inquiry, not matter how unpromising."  Hardy, 132 S. Ct. at 495

10 (internal citation omitted).  In Hardy, the Supreme Court found that the state court

11 reasonably determined that the prosecution showed sufficient due diligence in trying to find

12 a witness when the investigators contacted her family members, her school, the family of

13 her prior boyfriend, the morgue, the jail, the post office, the welfare department, the public

14 health department, and immigration authorities, even though the investigators failed to

15 contact the witness's current boyfriend or her past school.  Hardy, 132 S. Ct. at 493-94.

16 Similarly here, the Court of Appeal's conclusion that the prosecution showed sufficient

17 diligence was not unreasonable, nor did the Court of Appeal unreasonably apply the facts in

18 light of the evidence.  28 U.S.C. § 2254(d)(1)&(2).

19       Petitioner also complains that he did not have an adequate opportunity to cross-

20 examine Fernandez at the preliminary hearing, because a preliminary hearing ordinarily is a

21 "much less searching exploration into the merits of the case than a trial."  (Petition, Attach. A

22 at 2.)  The Constitution requires only an opportunity for cross-examination; an inquiry into

23 the effectiveness of the cross-examination of Fernandez at the preliminary hearing is not

24 required.  Roberts, 448 U.S. at 73 n.12; see also Delaware v. Fensterer, 474 U.S. 15, 20

25 (1985) ("Generally speaking, the Confrontation Clause guarantees an *opportunity* for

26 effective cross-examination, not cross-examination that is effective in whatever way, and to

27 whatever extent, the defense might wish.")(emphasis in original).

28

Accordingly, the Court of Appeal's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the United States Supreme Court.  28 U.S.C. § 2254(d).  Ground One does not warrant federal habeas relief.

II.   **GROUND TWO DOES NOT WARRANT FEDERAL HABEAS RELIEF.**

In Ground Two, Petitioner contends that trial counsel rendered ineffective assistance, in violation of the Sixth Amendment, because he did not argue at the due diligence hearing that the prosecution should have invoked the provisions of the Treaty.  (Petition at 5, Attach. A at 4.)  For the reasons set forth below, the California Court of Appeal's rejection of this claim in a reasoned decision was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the United States Supreme Court.  28 U.S.C. § 2254(d)(1).

A.   **Applicable Clearly Established Federal Law**

Review of an ineffective assistance of counsel claim involves a two-step analysis. See Strickland v. Washington, 466 U.S. 668, 687 (1984).  First, Petitioner must prove that his attorney's representation fell below an objective standard of reasonableness.  Id. at 687-88.  Second, Petitioner must show that he was prejudiced by counsel's deficient performance.  Id. at 687.  Petitioner must prove both elements.  Id.  The Court may reject the petitioner's claims upon finding either that counsel's performance was reasonable or that the claimed error was not prejudicial.  Id. at 697; see Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002)("[f]ailure to satisfy either prong of the Strickland test obviates the need to consider the other").

Moreover, courts generally maintain a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  Indeed, the Supreme Court dictates that "[j]udicial scrutiny of counsel's performance must be highly deferential." Id.  In order to show that his counsel's performance was objectively unreasonable, Petitioner must overcome the strong presumption that the challenged action might be considered sound trial strategy under the circumstances.  Id.  A

1   reasonable tactical decision by counsel with which Petitioner disagrees cannot form a basis

2   for an ineffective assistance of counsel claim.  See id. at 690.  The Court does not consider

3   whether another lawyer with the benefit of hindsight would have acted differently than

4   Petitioner's trial counsel.  Id. at 689.  Instead, the Court looks only to whether Petitioner's

5   trial counsel made errors so serious that counsel failed to function as guaranteed by the

6   Sixth Amendment.  Id. at 687.  In conducting this analysis, the Court must make "every

7   effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

8   counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

9   time."  Id. at 689.

10      Assuming that Petitioner can show that his counsel's performance was

11  unreasonable, the Court still must determine whether counsel's performance prejudiced

12  Petitioner.  See Strickland, 466 U.S. at 694.  Petitioner can prove prejudice by

13  demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the

14  result of the proceeding would have been different."  Id.  A "reasonable probability" is "a

15  probability sufficient to undermine confidence in the outcome."  Id.

16      To succeed on an ineffective assistance of counsel claim governed by Section

17  2254(d), "it is not enough" to persuade a federal court that the Strickland test would be

18  satisfied if a claim "were being analyzed in the first instance."  Bell v. Cone, 535 U.S. 685,

19  698-99 (2002).  It also "is not enough to convince a federal habeas court that, in its

20  independent judgment, the state-court decision applied Strickland incorrectly."  Id. at 699.

21  Rather, Petitioner must show that the state courts "applied Strickland to the facts of his case

22  in an objectively unreasonable manner."  Id.; see also Woodford v. Visciotti, 537 U.S. 19,

23  24-25 (2002).

24      **B.**   **California Court of Appeal's Decision**

25      The California Court of Appeal rejected Petitioner's ineffective assistance claim,

26  stating that it did not need to decide whether trial counsel's performance was deficient

27  because Petitioner had not showed prejudice from the prosecutor's failure to invoke the

28

1  Treaty.  The prosecutor's declaration showed that she did all she reasonably could have

2  done to obtain the assistance of the Mexican authorities in locating Fernandez.  (LD 7 at 7.)

3  **C.**    **Analysis**

4  Petitioner contends that trial counsel was ineffective because he failed to argue to the

5  trial court that the prosecution's failure to invoke the provisions of the Treaty in seeking the

6  assistance of the Mexican authorities demonstrated a lack of due diligence in attempting to

7  locate Fernandez.  (Petition, Attach. at 4.)

8  Petitioner is referring to Article 13, Section 1 of the Treaty, which provides: " "The

9  requested Party [i.e. Mexico] shall take all necessary measures to locate or identify persons

10  who are believed to be in that State and who are needed in connection with an investigation,

11  prosecution, or proceeding within the scope of this Treaty."  (Petition, Exh. A at 6.)

12  However, according to the declaration submitted by the prosecutor to the trial court, the

13  prosecutor contacted the Mexican Consulate and requested assistance in locating

14  Fernandez, but was informed that the Consulate "needed more information to assist, i.e.,

15  the town/city in Veracruz where [Fernandez] supposedly resides."  (LD 10, Exh. A at 9.)

16  There is no reasonable likelihood that invoking the Treaty would have changed the

17  Consulate's response.  The Treaty provides that the a request for assistance shall include

18  "[t]o the extent necessary and possible," "available information on the . . . whereabouts of a

19  person to be located" and "location of persons from whom evidence is sought."  (Petition,

20  Exh. A at 3 [Treaty, Art. 4, § 3(a)&(c)].)  The prosecutor could not give the Consulate further

21  information about Fernandez's whereabouts because she did not have it.  An argument by

22  trial counsel that the prosecutor should have invoked the Treaty would have been futile, and

23  trial counsel was not ineffective for failing to make it.  See Rupe v. Wood, 93 F.3d 1434,

24  1445 (9th Cir. 1996); James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994).

25  Accordingly, the California Court of Appeal's rejection of Petitioner's ineffective

26  assistance claim was not contrary to, or an unreasonable application of, clearly established

27  federal law.  28 U.S.C. § 2254(d)(1).  Ground Two does not warrant federal habeas relief.

28  / / /

**III.** **PETITIONER IS NOT ENTITLED TO AN EVIDENTIARY HEARING.**

Petitioner requests an evidentiary hearing. (Petition at 1.) The United States Supreme Court has held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011). Moreover, an evidentiary hearing is not warranted where, as here, "the record refutes the applicant's factual allegations or otherwise precludes habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007). Accordingly, Petitioner's request for an evidentiary hearing is denied.

**ORDER**

Petitioner is not entitled to relief on the claims in his Petition.

Accordingly, IT IS HEREBY ORDERED that the Petition is denied, and Judgment shall be entered dismissing this action with prejudice.

DATED: August 14, 2014                    /s/John E. McDermott
                                        JOHN E. MCDERMOTT
                                        UNITED STATES MAGISTRATE JUDGE

17